## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

**STATON TECHIYA, LLC,**

     **Plaintiff,**

**v.**

**HARMAN INTERNATIONAL
INDUSTRIES, INC.,**

     **Defendant.**

**Court No. 1:23-cv-00801-JCG**

### OPINION AND ORDER

This matter involves patent infringement claims filed by Staton Techiya, LLC ("Plaintiff" or "Techiya") against Harman International Industries, Inc. ("Defendant" or "Harman"), alleging infringement of three patents involving automotive acoustic management systems. For the reasons discussed below, the Court denies in part and grants in part Harman's motion to dismiss the claims.

### I.  Background

Techiya is the exclusive owner by assignment of U.S. Patents Nos. 8,319,620 ("the '620 Patent"), 11,589,329 ("the '329 Patent"), and 11,610,587 ("the '587 Patent") (collectively, "Asserted Patents"), and holds all rights, title, and interest in them. Compl. ¶¶ 4–6, 30, 44, 58 (D.I. 1).

The '620 Patent is titled "Ambient Situation Awareness System and Method for Vehicles," and was issued by the U.S. Patent and Trademark Office ("USPTO") on November 27, 2012.  Id. at Ex. A ("'620 Patent").  The '329 Patent is titled "Information Processing Using a Population of Data Acquisition Devices," and was issued by the USPTO on February 21, 2023.  Id. at Ex. B ("'329 Patent").  The '587 Patent is titled "Personalized Sound Management and Method," and was issued by the USPTO on March 21, 2023.  Id. at Ex. C ("'587 Patent").

### A.     Factual Allegations

Techiya's patented technologies combine disciplines of acoustic management technology, particularly in the automotive field.  Id. ¶ 12.  The Complaint alleges that Harman provides automotive acoustic management technology that implements Techiya's patented technologies.  Id. ¶ 13.

No later than February 8, 2019, Techiya and Harman met to discuss Techiya's patented technology and ongoing field of research and development efforts in the automotive acoustic management technology.  Id. ¶ 14.  Techiya met with Harman's Vice President of Technology Strategy, Kevin Hague.  Id.  Because of their prior intellectual property discussions in related fields, Techiya and Harman had already consented to a mutual non-disclosure agreement.  Id. ¶ 15.  The mutual non-disclosure agreement protected disclosure of information, including to parent entities of Harman.  Id.

Beginning in October 2018, Techiya sent studies, marketing materials, and prototypes to Harman. Id. ¶ 16. After Harman reviewed the information, Harman's Senior Principal Engineer of Acoustics, Todd Welti, conducted various tests on the prototypes. Id. ¶ 17. Harman subsequently requested additional information and more prototypes, and Techiya provided additional prototypes and proprietary whitepapers. Id.

In February 2019, Techiya sent Harman an "Opportunity Overview" slide deck in a follow-up message to a meeting. Id. ¶ 18. The deck contained an enumeration of several different advantages offered by Plaintiff's technology and a description of patents relevant to some of the related fields. Id. The '620 Patent was identified in the deck. See id.

In March 2019, Techiya met with Harman's Chief Financial Officer ("CFO") Evelyn Heinbach, who asked questions about Techiya's intellectual property and whether Techiya could provide demonstrations and technical background on its patented technology. Id. ¶ 19.

On May 15, 2019, Techiya presented to Harman a comprehensive valuation model of Techiya's intellectual property arranged in a spreadsheet, which contained hundreds of patents and patent applications, as categorized by feature and technology. Id. ¶ 20.

On May 4, 2020, Evelyn Heinbach confirmed that "Samsung has done a detailed review of [Techiya's] patent portfolio." Id. ¶ 21. She informed Techiya that Harman would not be "looking to pursue further steps at this point" on May 23, 2020. Id. ¶ 22.

### B.    The Accused Product

The Harman HALOsonic (the "Accused Product") is an automotive acoustic management system, which utilizes an array of accelerometers and microphones to generate a desired audio signal within the cabin of the vehicle. See id. ¶¶ 36, 50, 64. The system is implemented in the cockpit of the vehicle, and the cockpit functions as a controller or as a user interface, a processor, memory to store instructions, and an audio buffer. See id. ¶¶ 50, 64. External microphones are placed on the exterior of the vehicle and used to capture ambient sound external to the vehicle to produce an ambient sound signal. Id. ¶¶ 36, 50, 64. Internal microphones are used to measure an internal acoustic signal within the cabin of the vehicle. See id.

### C.    Procedural History

On July 25, 2023, Techiya filed its Complaint alleging that Harman directly, indirectly, and willfully infringed the Asserted Patents with the Accused Product. See id. ¶ 25. Plaintiff seeks declaratory judgment, monetary damages, and injunctive relief. See id. ¶ 72.

On November 29, 2023, Harman moved to dismiss the Complaint.  Def.'s
Mot. Dismiss ("Def.'s Mot.") (D.I. 14); Def.'s Opening Br. Supp. Mot. Dismiss
Failure State Claim ("Def.'s Moving Br.") (D.I. 15).  Techiya opposed the motion,
and Harman filed its reply brief.  Pl.'s Resp. Br. Opp'n Def.'s Mot. Dismiss
Failure State Claim ("Pl.'s Opp'n Br.") (D.I. 27); Def.'s Reply Supp. Mot. Dismiss
Failure State Claim ("Def.'s Reply Br.") (D.I. 32).

The Court held oral argument on April 10, 2024.  Oral Arg. (Apr. 10, 2024).
The Parties also filed supplemental authority with the Court.  See Def.'s April 8
Letter Suppl. Authority (D.I. 40); Pl.'s April 23 First Letter Suppl. Authority (D.I.
41); Pl.'s April 23 Second Letter Suppl. Authority (D.I. 42); Def.'s April 25 Letter
Resp. Pl.'s Suppl. Authority (D.I. 43); Def.'s May 3 Letter Suppl. Authority (D.I.
44).

## II.    Legal Standard

Federal Rule of Civil Procedure 8(a) requires that pleadings contain a short
and plain statement of the claim showing that the pleader is entitled to relief.  Fed.
R. Civ. P. 8(a)(1).  If pleadings fail to state a claim, in whole or in part, on which a
court may grant relief, a defendant may seek to dismiss a complaint under Federal
Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  "To survive a motion
to dismiss, a complaint must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." Id. Plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully." Id. In considering a motion to dismiss, the Court

must assume the factual allegations contained in the complaint to be true and draw

all reasonable inferences in favor of the non-moving party. Twombly, 550 U.S.

555–56. However, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to state a claim. Iqbal,

556 U.S. at 679.

In patent infringement cases, allegations of infringement are governed by the

Iqbal/Twombly pleading standard. Golden v. Apple Inc., 819 F. App'x 930, 930–

31 (Fed. Cir. 2020). There must be some factual allegations that, when taken as

true, articulate why it is plausible that the accused product infringes the patent

claim. Bot M8 LLC v. Sony Corp., 4 F.4th 1342, 1353 (Fed. Cir. 2021).

## III. Discussion

Harman moves to dismiss all claims for Counts I to III, and also moves to

dismiss Count II for lack of patent eligible subject matter under 35 U.S.C. § 101.

Def.'s Mot. at 1.

### A.     Infringement of the '620 Patent (Count I)

Count I alleges that Harman directly, indirectly, and willfully infringed, and continues to infringe, at least claim 1 of the '620 Patent with the Accused Product. Compl. ¶¶ 31, 37, 42.  Harman moves to dismiss Count I for failure to plead infringement.  Def.'s Mot. at 1.

### 1.     Direct Infringement

Liability for direct infringement arises when a party "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  35 U.S.C. § 271(a).  To plead direct infringement, a plaintiff must recite "some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim."  Bot M8, 4 F.4th at 1353.  "[A] plaintiff cannot assert a plausible claim for infringement under the Iqbal/Twombly standard by reciting the claim elements and merely concluding that the accused product has those elements."  Id.  To satisfy the Iqbal pleading standard in a patent case, "[s]pecific facts are not necessary."  Disc Disease Sols. Inc. v. VGH Sols., Inc., 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quotation omitted). The complaint needs to only give a defendant "fair notice of what the [infringement] claim is and the ground upon which it rests."  Id.

Harman asserts that Techiya fails to plead the "notification device" of the Accused Product, which is a limitation of the '620 Patent, arguing that the Complaint only identifies accelerometers and microphones placed within the cabin and the exterior of the vehicle and a processor to determine a sound level.  Def.'s Moving Br. at 13–14.

Claim 1 of the '620 Patent describes:

A vehicle situation awareness device for a vehicle comprising:

a notification device in the vehicle configured to emit an audio signal;

an internal microphone configured to measure an internal acoustic signal in the vehicle;

an ambient microphone configured to measure an ambient acoustic signal external to the vehicle; and

a processor configured to:

determine an internal sound pressure level (SPL) in the vehicle based on the internal acoustic signal, identify at least one sonic signature from the ambient acoustic signal, and

when the at least one sonic signature is identified, determine whether to send an emit signal to the notification device to emit the audio signal based on the internal SPL.

'620 Patent at 9:12–28.

The Complaint alleges that the Accused Product is an automotive acoustic management system, "which utilizes an array of accelerometers and microphones to *generate a desired audio signal within the cabin of the vehicle*."  See Compl.

¶ 36 (emphasis added).  The Complaint alleges that external microphones are placed on the exterior of the vehicle and used to capture ambient sound external to the vehicle to produce an ambient sound signal; internal microphones are used to measure an internal acoustic signal within the cabin of the vehicle; and a processor is configured to determine an internal sound pressure level ("SPL") based on the acoustic signal, identifies at least one signature sound from the ambient acoustic signal, and then determines whether to send an emit signal to the *notification device*." Id. (emphasis added).

Techiya argues that the allegations of the Accused Product "generating a desired audio signal within the cabin of the vehicle" and "enabling sound contouring inside the car . . . through the standard speaker system," as described in the screenshot in paragraph 36 of the Complaint, when taken together, are sufficient to provide notice of a "notification device" because the standard speaker system provides audio signals in the cabin of the vehicle.  Pl.'s Opp'n Br. at 14.

Harman replies that even if such a "notification device" could be inferred from the "speaker" that enables sound contouring in the vehicle, these allegations do not plausibly allege a "notification device" because Techiya does not adequately state that the Accused Product contains a processor that determines "whether to send an emit signal to the notification device to emit the audio signal based on the internal

SPL" and that the "sound contouring" is based on the internal SPL as required by the claim.  Def.'s Reply Br. at 6.

The screenshot in paragraph 36 of the Complaint discusses three features: internal electronic sound synthesis ("IESS"), external electronic sound synthesis ("eESS"), and Sound2Target.  Compl. ¶ 36.  The IESS feature "*enables sound contouring* inside the car by creating speed-, acceleration-, and throttle-dependent sounds *through the standard speaker system*."  Id. (emphasis added).  Additional descriptions about the IESS feature include: "[a]dvanced synthesis tools allow complete flexibility for 'coloring the blank acoustic canvas' offered by today[']s electric and hybrid vehicle applications, in 'all-electric' mode"; "[s]ound synthesis during engine-off conditions on Hybrid Electric Vehicles or Range-Extended Electric Vehicles improves perception of engine start-stop events"; and "[i]mproved powertrain feedback makes drivers feel connected to the car they drive."  Id.  A description of the eESS feature states that "[a]dvanced sound synthesis technologies allow OEMs to define a unique external sound, matching their brand DNA and easily recognizable by anyone on the road."  Id.  The Sound2Target feature "[c]ombines Active Noise Cancellation and Electronic Sound Synthesis to simultaneously remove unwanted noise content and synthesize or augment desired sound content."  Id.

Taking all allegations in favor of the non-moving party, the Court holds that Techiya sufficiently pled its infringement claim at this stage in the proceedings. The allegations meet the Iqbal/Twombly standard by identifying the Accused Product and the specific functionality that is infringing, which is the generation of an audio signal within the cabin of the vehicle using the Accused Product's accelerometers and microphones, along with a processor that measures SPL. Therefore, the Complaint sufficiently pleads a direct infringement claim for the '620 Patent.

## 2.      Induced Infringement

Techiya filed a pre-suit induced infringement claim for the '620 Patent, alleging that Harman had notice of its infringement "at least since February 12, 2019, when [Harman] received the aforementioned slide deck from [Techiya]" and indirectly infringed and continues to indirectly infringe the '620 Patent by actively inducing infringement of the '620 Patent by others, such as users of the Accused Product within this district. Compl. ¶¶ 33, 37. A plaintiff can prevail on claims of induced infringement only if it first establishes direct infringement. See Limelight Networks, Inc. v. Akamai Techs., Inc., 572 U.S. 915, 921 (2014) ("[I]nducement liability may arise if, but only if, there is direct infringement.").

To plead induced infringement under 35 U.S.C. § 271(b), "a complaint must plead facts plausibly showing that the accused infringer specifically intended

another party to infringe the patent and knew that the other party's acts constituted infringement."  Lifetime Indus., Inc. v. Trim-Lok, Inc., 869 F.3d 1372, 1379 (Fed. Cir. 2017); see also 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer.").  This requires a plaintiff to allege facts supporting a reasonable inference that the defendant had knowledge of the patent-in-suit.  Global-Tech Appliances, Inc. v. SEB S.A. ("Global-Tech"), 563 U.S. 754, 764–66 (2011); see also bioMérieux, S.A. v. Hologic, Inc., No. 18-cv-00021-LPS, 2018 WL 4603267, at *5 (D. Del. Sept. 25, 2018).  "[U]nlike direct infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement."  Microsoft Corp. v. DataTern, Inc., 755 F.3d 899, 904 (Fed. Cir. 2014) (citing Global-Tech, 563 U.S. at 764–66).  Without knowledge of infringement, there is not enough to establish liability for induced infringement.  See Global-Tech, 563 U.S. at 765–66.  If actual knowledge is not adequately pled, a patentee can establish knowledge of patent infringement by showing that the defendant was willfully blind—i.e., by showing that the defendant (1) subjectively believed that there was a high probability that the induced acts constituted infringement and (2) took deliberate actions to avoid learning of that fact.  Id. at 769.

Specific intent is a distinct element from the knowing inducement of
infringing acts. "A party asserting a claim of induced infringement must plead
facts plausibly demonstrating that there has been direct infringement, and that 'the
alleged inducer knew of the patent, knowingly induced the infringing acts, and
possessed a specific intent to encourage another's infringement of the patent.'"
Tonal Sys., Inc. v. ICON Health & Fitness, Inc., No. 20-cv-01197-LPS, 2021 WL
1785072, at *3 (D. Del. May 5, 2021), report and recommendation adopted, 2021
WL 5860783 (D. Del. Aug. 12, 2021) (quoting Vita-Mix Corp. v. Basic Holding,
Inc., 581 F.3d 1317, 1328 (Fed. Cir. 2009)).

The '620 Patent was issued on November 27, 2012. Compl. ¶ 4. The
Complaint alleges that Harman met with Techiya to discuss Techiya's patented
technology and ongoing research and development efforts in the automotive
acoustic management field no later than February 8, 2019; Techiya sent to Harman
studies, marketing materials, and protypes under a mutual non-disclosure
agreement beginning in October 2018, and Harman's Senior Principal Engineer of
Acoustics conducted various tests on the prototypes and requested more
information and prototypes, which Techiya sent over; Techiya sent Harman an
"Opportunity Overview" slide deck in February 2019, which listed the '620 Patent;
and Techiya presented to Harman on May 15, 2019 a comprehensive valuation
model of Techiya's intellectual property arranged in a spreadsheet, which

contained hundreds of patents and patent applications, categorized by feature and technology; and Harman's CFO informed Techiya that Harman would not be "looking to pursue further steps" on May 23, 2020 after confirming a "detailed review" of Techiya's patent portfolio on May 4, 2020. Id. ¶¶ 14–23. Based on these factual allegations, the Complaint plausibly pleads that Harman had knowledge and notice of the '620 Patent. The Complaint also adequately pleads that Harman induced infringement by users of the Accused Product. See, e.g., Compl. ¶ 36. Therefore, Techiya's pre-suit claim for induced infringement of the '620 Patent is sufficiently pled.

### 3.   Willful Infringement

Techiya filed a pre-suit willful infringement claim for the '620 Patent, alleging that Harman infringed "at least since February 12, 2019, when [Harman] received the aforementioned slide deck from Techiya," willfully infringed and continues to infringe the '620 Patent. Compl. ¶¶ 33, 42.

Under 35 U.S.C. § 284, the Court may increase the amount of damages assessed by up to three times. 35 U.S.C. § 284. The U.S. Supreme Court has observed that enhanced damages:

> are not to be meted out in a typical infringement case, but are instead designed as a "punitive" or "vindictive" sanction for egregious infringement behavior. The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton,

malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—
indeed—characteristic of a pirate.

Halo Elecs., Inc. v. Pulse Elecs. Inc. ("Halo"), 579 U.S. 93, 104–05 (2016).

For willful infringement claims, "the patentee must allege facts in its

pleading plausibly demonstrating that the accused infringer had committed

subjective willful infringement as of the date of the filing of the willful

infringement claim." Välinge Innovation AB v. Halstead New England Corp., No.

16-cv-01082-LPS-CJB, 2018 WL 2411218, at *10–12 (D. Del. May 29, 2018),

report and recommendation adopted, 2018 WL 11013901 (D. Del. Nov. 6, 2018).

"The subjective willfulness of a patent infringer, intentional or knowing, may

warrant enhanced damages, without regard to whether his infringement was

objectively reckless." Halo, 579 U.S. at 105; see also WBIP, LLC v. Kohler Co.,

829 F.3d 1317, 1341 (Fed. Cir. 2016). Subjective willfulness may be found when

"the risk of infringement 'was either known or so obvious that it should have been

known to the accused infringer.'" Halo, 579 U.S. at 101 (quoting In re Seagate

Techs., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007)).

Techiya alleges that Harman "engaged in such activities [of infringement]

despite an objectively high likelihood that its actions constituted infringement and

inducement of infringement of the '620 Patent." Compl. ¶ 41. Techiya further

alleges that Harman "knew and should have known that its actions would cause

direct and induced infringement of the '620 Patent, and on information and belief,

[Harman has] monitored the substantial prior art submissions made prior to issuance

of the '620 [P]atent."  Id.

At the pleading stage, the patentee "must allege facts in its pleading

plausibly demonstrating that the accused infringer had committed subjective

willful infringement as of the date of the filing of the willful infringement

claim." Välinge Innovation AB, 2018 WL 2411218, at *10–12.  This standard can

be distilled into three elements, that the accused infringer: (1) was aware of the

patent, (2) infringed the patent after becoming aware of its existence, and (3) knew

or should have known that its conduct amounted to infringement.  See id. at *13.

Considering the discussions between Harman and Techiya, which involved

Techiya's submissions of studies, marketing materials, prototypes, a spreadsheet

and an "Opportunity Overview" slide deck of its patents, which included the '620

Patent, it is plausibly established that Harman had knowledge of the '620 Patent.

The alleged facts, viewed in the light most favorable to the non-moving party,

plausibly support the inference that Harman knew or had a high likelihood of

knowing that the Accused Product infringed the '620 Patent.  Because the

Complaint adequately states Harman's pre-suit knowledge of the patent and that

Harman knowingly infringed the '620 Patent, Techiya's pre-suit willful

infringement of the '620 Patent is sufficiently pled.

Accordingly, Count I sufficiently pleads direct, induced, and willful infringement of the '620 Patent.

## B.    Infringement of the '329 Patent (Count II)

Count II alleges that Harman directly, indirectly, and willfully infringed, and continues to infringe, the '329 Patent with the Accused Product.  Compl. ¶¶ 45, 51, 56.  Harman moves to dismiss Count II for lack of patent-eligible subject matter, and in the alternative, also moves to dismiss Count II for failure to plead a claim for induced and willful infringement.  See Def.'s Mot. at 1.

## 1.    Patent-Eligible Subject Matter

35 U.S.C. § 101 makes patentable "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  This broad provision has an important exception: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." Alice Corp. Pty. Ltd. v. CLS Bank Int'l ("Alice"), 573 U.S. 208, 216 (2014).  The purpose of these exceptions is to protect the "basic tools of scientific and technological work."  Mayo Collaborative Servs. v. Prometheus Labs., Inc. ("Mayo"), 566 U.S. 66, 71 (2012).  Eligibility "is a question of law" with "underlying questions of fact."  Simio, LLC v. FlexSim Software Prods., Inc., 983 F.3d 1353, 1358–59 (Fed. Cir. 2020).

In <u>Alice</u>, the Supreme Court reaffirmed the two-step framework set forth in <u>Mayo</u> for distinguishing patents that claim ineligible subject matter from those that claim patent-eligible applications of those concepts.  <u>Alice</u>, 573 U.S. at 217.

In step one, the court must determine whether the claims are drawn to a patent-ineligible concept, such as an abstract idea.  <u>Id.</u>  To do so, the court examines the focus of the claim and its character as a whole.  <u>SAP Am., Inc. v. InvestPic, LLC</u>, 898 F.3d 1161, 1167 (Fed. Cir. 2018).  Courts must consider whether the focus of the claims is on "the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool."  <u>Finjan, Inc. v. Blue Coat Sys., Inc.</u> ("<u>Finjan</u>"), 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting <u>Enfish, LLC v. Microsoft Corp.</u> ("<u>Enfish</u>"), 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)).

If the claims are drawn to an abstract idea at step one of the analysis, the court then turns to step two to examine "the elements of the claim both individually and as an ordered combination" to see if there is an "inventive concept—<i>i.e.</i>, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."  <u>Alice</u>, 573 U.S. at 217–18 (citation omitted).  "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea."  <u>Id.</u>

at 221.  Such "additional features" are not enough to constitute an inventive concept if they are "well-understood, routine, conventional activities."  Id. at 225 (citation omitted).  To transform an unpatentable concept into a patent-eligible application, "one must do more than simply state the [ineligible concept] while adding the words 'apply it.'"  Mayo, 566 U.S. at 72 (emphasis omitted).

### a.    Representative Claim

A claim is representative if it does not differ significantly from other claims recited in the patent, and courts may treat a claim as representative if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim.  See Berkheimer v. HP Inc., 881 F.3d 1360, 1365 (Fed. Cir. 2018).  The Parties do not contest claim 1 of the '329 Patent as the representative claim.  See Compl. ¶ 46; Def.'s Moving Br. at 11; Pl.'s Opp'n Br. at 4–11; Def.'s Reply Br. at 2.

Claim 1 of the '329 Patent recites:

A system comprising:

a device among a plurality of acoustic devices; wherein the device is configured as a controller, wherein the controller is configured to perform operations comprising:

selecting a subset of acoustic devices from among the plurality of acoustic devices for acquiring sensor acoustic data, wherein the subset of acoustic devices are configured to interchange device information and data over a communication link;

receiving a first set of sensor acoustic data from a first acoustic device
of the selected subset of acoustic devices;

receiving a second set of sensor acoustic data from a second acoustic
device of the selected subset of acoustic devices; and

analyzing at least one of the first set of sensor acoustic data or the second
set of sensor acoustic data or a combination of both to identify if speech
is present.

'329 Patent at 23:30–24:3.

### b.    The Parties' Contentions

Harman contends that claim 1 of the '329 Patent is directed to the abstract

idea of detecting speech (through the collection and analysis of data) and lacks an

inventive concept. See Def.'s Moving Br. at 4–12. Harman asserts that claim 1

uses conventional hardware, specifically a plurality of "acoustic devices" and a

"device" configured as a "controller," and compares the "controller" to the human

brain and the "acoustic devices" to human ears. Id. at 6–7. Further, Harman

asserts that the '329 Patent detects speech that already exists (not requiring any

action taken after the detection of speech) and fails to specify how the system

analyzes the speech or acoustic data with underlying technology. Id. at 6.

Techiya asserts that Harman overgeneralizes the '329 Patent because claim 1

is directed to "technical solutions to technical problems particular to computer

systems" and involves an inventive concept from the distributed architecture. See

Pl.'s Opp'n Br. at 4–11. Techiya contends that Harman's § 101 challenge is

dependent on incorrect claim construction of several terms, which makes it premature at the motion to dismiss stage.  Id. at 11–13.

Harman replies that Techiya's "directed to" argument fails because Techiya focuses on unclaimed portions of the '329 Patent, rather than the claims themselves, and the idea of "a distributed network of acoustic devices that communicate information and data" is abstract.  Def.'s Reply Br. at 1–3.  Harman asserts that its § 101 challenge is not premature at the motion to dismiss stage because Techiya does not disagree that the components are generic, routine, and conventional, nor provide information on how to correctly construe claim terms that allegedly deviate from their plain and ordinary meaning.  Id. at 5.

### c.    Alice Step One

The Court first assesses Alice's step one, examining the "character as a whole" or "focus" of the claims to determine whether they are "directed to" an abstract idea.  District courts may compare the claims at issue to claims already found to be directed to an abstract idea in previous cases to inform the step one analysis.  See Enfish, 822 F.3d at 1334.

Detection of speech, without more, may be akin to the collection and analysis of audio data.  The U.S. Court of Appeals for the Federal Circuit ("CAFC") has "treated collecting information, including when limited to particular content (which does not change its character as information), [as] within the realm

of abstract ideas," along with the analysis and display of information.  See Elec.

Power Grp., LLC v. Alstom S.A., 830 F.3d 1350, 1353 (Fed. Cir. 2016); see also

In re TLI Commc'ns LLC Patent Litig., 823 F.3d 607, 611 (Fed. Cir. 2016);

FairWarning IP, LLC v. Iatric Sys., Inc., 839 F.3d 1089, 1095 (Fed. Cir. 2016);

CardioNet, LLC v. InfoBionic, Inc., 816 F. App'x 471, 475 (Fed. Cir. 2020);

Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n, 776

F.3d 1343, 1347 (Fed. Cir. 2014).  The Parties agree that the detection of speech is

an abstract idea.  See Def.'s Moving Br.; Pl.'s Opp'n Br.

Claims that are merely directed to an abstract idea and applied with generic,

conventional computer components have been held consistently to be patent-

ineligible.  See Intell. Ventures I LLC v. Capital One Bank (USA), 792 F.3d 1363,

1367–69 (Fed. Cir. 2015) (claims adding generic computer components to

financial budgeting); OIP Techs. Inc. v. Amazon.com, Inc, 788 F.3d 1359, 1362–

64 (Fed. Cir. 2015) (claims implementing offer-based price optimization using

conventional computer activities); Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709,

714–17 (Fed. Cir. 2014) (claims applying an exchange of advertising for

copyrighted content to the internet); buySAFE, Inc. v. Google, Inc., 765 F.3d 1350,

1354–55 (Fed. Cir. 2014) (claims adding generic computer functionality to the

formation of guaranteed contractual relationships).

The '329 Patent purports to use a distributed system, using a controller and more than one device (such as cellular devices), to acquire certain information about the external environment based on the combination of audio received through the sensors of such devices.  The controller serves as the central point for the audio received by the sensors of multiple devices to produce information about the external environment.  This information varies based on the type of application, with some of the example-use cases including, but not limited to: epidemiological data about pertussis, asthma, and related illnesses based on the detection of coughs; personal health data about breathing disorders through the detection of abnormal breathing during sleep; noise level data for safety or tracking reasons in the work place or highways based on sound pressure; marketing data about music trends based on detection of music being played; tracking data to predict traffic flow based on sirens or for vehicular or pedestrian traffic; and forensic data based on the source of a possible gunshot.  See '329 Patent at 12:01–16:05.

The Court turns to Techiya's first argument that the '329 Patent is "directed to a distributed network architecture that improves upon various facets of computer technology, such as user tracking, receiving audio as user inputs, and differentiating from those user inputs and ambient noise."  Pl.'s Opp'n Br. at 2. Techiya contends that the '329 Patent is directed to a non-abstract idea because the patented system's tracking of user behavior within an environment, aggregation of

audio inputs from the user, and differentiation of user inputs and ambient noise provide "technical solutions to technical problems."  Id. at 4–5.

Harman contends that Techiya improperly relies on the claim specifications to "read" the purported non-abstract idea of providing "technical solutions to technical problems" into the claims of the '329 Patent.  See Def.'s Reply Br. at 1–3.  Harman asserts that the claims fail to specify how the claimed "controller" performs its function and also fail to recite terms that support the focus of the claims as being "a distributed network architecture that improves upon various facets of computer technology," such as the terms "distributed network architecture," "computer technology," "user tracking," "receiving audio as user inputs," or "differentiating between user inputs and ambient noise."  See id. at 1–2.

The CAFC has upheld varying degrees of reliance on the language of the patent specification and the patent claims themselves to determine eligibility under § 101 or what constitutes as an "abstract idea."  The CAFC has found patent eligibility supported by the patent specification.  See e.g., Amdocs (Israel) Ltd. v. Openet Telecom, Inc. ("Amdocs"), 841 F.3d 1288, 1301 (Fed. Cir. 2016) (Reyna, J., dissenting); but see AI Visualize, Inc. v. Nuance Commc'ns, Inc. ("AI Visualize"), 97 F.4th 1371 (Fed. Cir. 2024) (Reyna, J.).

Harman analogizes the instant case to AI Visualize, a case in which the CAFC did not allow for any reading in of the patent specification into the claims

when details from the specification were not themselves claimed.  <u>See</u> Def.'s April

8 Letter Suppl. Authority at 1.  The CAFC in <u>AI Visualize</u> "refuse[d] to import

details from the specification [because] those details are themselves not claimed,"

holding that claims involving the visualization of magnetic resonance imaging

("MRI") scans were held to be directed to an abstract idea because the claims did

not recite "how to create frames or virtual views, much less in a manner that would

meaningfully support a technical solution to a technical problem in the prior art."

<u>AI Visualize</u>, 97 F.4th at 1379.  The CAFC refused to consider the "multiple

passages of patent specification discussing the creation of virtual views as a

technical solution to a technical problem" to read into the claims a non-abstract

idea.  <u>Id.</u>

     The CAFC has consistently considered, however, the patent specification to

determine the focus of patent claims to understand "the problem facing the

inventor," as well as what the patent describes in the invention.  <u>See, e.g</u>,

<u>EcoServices, LLC v. Certified Aviation Servs., LLC</u>, 830 F. App'x 634, 654 (Fed.

Cir. 2020); <u>TLI Commc'ns</u>, 823 F.3d at 611–12; <u>Ariosa Diagnostics, Inc. v.

Sequenom, Inc.</u>, 788 F.3d 1371, 1376 (Fed. Cir. 2015); <u>cf. Synopsys, Inc. v.

Mentor Graphics Corp.</u>, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("[t]he § 101 inquiry

must focus on the language of the Asserted Claims themselves.").  "[W]hile the

specification may help illuminate the true focus of a claim, when analyzing patent

eligibility, reliance on the specification must always yield to the claim language in identifying that focus" because "the concern that drives the judicial exceptions to patentability is 'one of preemption' . . . and the claim language defines the breadth of each claim."  ChargePoint, Inc. v. SemaConnect, Inc. ("ChargePoint"), 920 F.3d 759, 766 (Fed. Cir. 2019) (internal quotations and citations omitted); see also Trinity Info Media, LLC v. Covalent, Inc., 72 F.4th 1355, 1361 (Fed. Cir. 2023) (quoting ChargePoint, 920 F.3d at 766).

The CAFC's differing approaches in its cases may be illustrated by Amdocs. The majority in Amdocs found that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporate[] the invention's distributed architecture—an architecture providing a technological solution to a technological problem."  Amdocs, 841 F.3d at 1301. The majority found this distributed enhancement to be a "critical advancement over the prior art," citing to a paragraph in the patent specification.  Id.  However, the dissent in Amdocs criticized the majority's use of the patent specification to find an inventive concept.  Id. at 1307 ("But the inquiry is not whether the specifications disclose a patent-eligible system, but whether the claims are directed to a patent ineligible concept.").  The Amdocs majority explained this difference by stating that the majority considered the "means-plus-function"

practice (as codified under 35 U.S.C. § 112(f)[1]), while the Amdocs dissent focused

on the difference between "means" and "ends," when "a desired goal (i.e., a 'result

or effect'), absent structural or procedural means for achieving that goal, is an

abstract idea."[2] Id. at 1295.

The patented system generally uses audio acquisition capabilities of one or

more of the devices to extract information related to the views of the audio scene

by one or more of the devices, and every device can continually transmit its

acquired signals over the communication to a central server. See '329 Patent at

4:50–59. Claim 1 recites a method of receiving sensor acoustic data with a

"controller" and multiple acoustic devices to provide data specific to a user or

situation indicated by a user. The "plurality of acoustic devices" is made up of a

"controller" and other acoustic devices, akin to "a distributed network

architecture." The "controller" works with select acoustic devices ("among a

---

[1] "An element in a claim for a combination may be expressed as a means or step
for performing a specified function without the recital of structure, material, or acts
in support thereof, and such claim shall be construed to cover the corresponding
structure, material, or acts described in the specification and equivalents thereof."
35 U.S.C. § 112(f).

[2] The majority describes the "means-plus-function" practice as: "Patentees could
write claim language to broadly describe the purpose or function of their invention,
and when they did the claim would not cover the bare function or goal, however
performed, but only as limited to the particular means (and equivalents) for
implementing that function or goal as described by the patentee in the patent's
'specification.'" Amdocs, 841 F.3d at 1295.

plurality of acoustic devices") to acquire sensor acoustic data. The "controller"

acquires sensor acoustic data by working with at least two acoustic devices from

the selected subset of acoustic devices. The "controller" receives the "first set of

sensor acoustic data" from the first selected acoustic device and the "second set of

sensor acoustic data" from the second selected acoustic device. After the sensor

acoustic data are received, the "controller" then analyzes either one of the sets of

data or both sets of data to identify speech. The patent specification explains that

the "controller" is the device (or devices, since more than one device can act as

"controllers") that selectively acquires sensor information among the devices and

determines "a characteristic of [the] audio scene." See id. at 4:55–61.

The "controller" and the multiple acoustic devices work with its local

environment to provide different kinds of information (such as the "technical

solutions" described by Techiya) for different kinds of situations (such as the

"technical problems" described by Techiya). The dependent claims of the '329

Patent demonstrate that the "controller" works with the other select devices to

perform functions, such as "analyzing the speech for a keyword" (claim 2);

"receiv[ing] [the sensor acoustic data] based on a triggering event" (claim 3);

"determining a direction of measurement of at least one device" (claim 4);

"selecting the subset of devices based on geographic proximity to a user" (claim

5); "activating a sensor based upon a keyword" (claim 6); "generating an alert

signal based upon an analysis [of the sensor acoustic data]" (claim 7); "analyzing [the sensor acoustic data] for animal sounds" (claim 8); "determining the locations of each of the selected subset of acoustic devices" (claim 9); "determining which of the selected subset of acoustic devices is the closest acoustic device to a user that uttered the keyword" (claim 10); and "determining a voice command from the keyword [to send] the voice command to the closest acoustic device" (claim 11).

These different kinds of information generated by the system may be combined in a way to identify certain data, such as geographic or social group trends based on keywords spoken or other events. See id. at 3:14–22. The functions recited in the dependent claims may provide "technical solutions" to "technical problems" in several examples, as discussed above: epidemiological data based on the detection of coughs; personal health data about breathing disorders based on the detection of abnormal breathing during sleep; noise level data for safety or tracking reasons in the work place or highways based on sound pressure; marketing data about music trends based on detection of music being played; tracking data to predict traffic flow based on sirens or for vehicular or pedestrian traffic; and forensic data based on the source of a possible gunshot. See id. at 12:01–16:05.

When read together with the patent specification and dependent claims, the Court concludes that claim 1 supports Techiya's argument that the '329 Patent is

directed to the non-abstract idea of "providing technical solutions for technical problems to computer systems."  See Def.'s Opp'n Br. at 4–5.

The Court now turns to Techiya's second argument, that the '329 Patent is not directed to an abstract idea because of its non-conventional configuration of components.  See Pl.'s April 23 Second Letter Suppl. Authority at 1 (citing Inmar Brand Solutions, Inc. v. Quotient Tech. Inc. ("Inmar"), No. 23-cv-00994, 2024 WL 1675036 (D. Del. Apr. 18, 2024) (holding that patent claims involving coupon-clearing technology were directed to "the non-abstract idea of processing coupons with a computer system configured in a particular way to overcome flaws in prior art systems").  Harman contends that Inmar is distinguishable from the instant case because the patent claims in Inmar "describe[d] in detail the location, configuration, and usage of the components used to improve upon the coupon-clearing process," but the claims of the '329 Patent "merely identify the components of the claimed system" and fail to describe how they "add benefits to or improve upon the process of speech detection."  See Defs.' April 25 Letter Resp. Pl.'s Suppl. Authority at 1.

Claims may also be found to be directed to a non-abstract idea in step one of the Alice inquiry if the claims are directed to "the specific asserted improvement in computer capabilities."  See Finjan, 879 F.3d at 1303.  In Inmar, the court concluded that "the focus of the claimed advance is validating and processing

coupons through the use of a remote server that has advantages that humans cannot provide, like the reduction of coupon fraud, because of its purportedly novel configuration" in <u>Alice</u>'s step one.  <u>Inmar</u>, 2024 WL 1675036, at \*6.  The court reasoned that "the claimed system makes clearing coupons more efficient and less prone to error through the use of the remote server that can accurately process coupons, detect fraud, and communicate between multiple manufacturers and retailers in real-time," and was thus "an improved existing coupon processing architecture, which eliminates the prior processes, and replaces them with substantively different processes that significantly reduce fraud and could not be accomplished by humans."  <u>Id.</u>

The patented technology in <u>Inmar</u> involved communication between a retail store and an Intelligent Clearing Network ("ICN") server.  <u>Id.</u> at \*1.  The retail store's point-of-sale terminal transmitted coupon data to its own point-of-sale "controller," which then transmitted the data to the remote ICN server "for coupon redemption, validation, and financial settlement."  <u>Id.</u> at \*3.  The ICN server executed software applications that processed coupons for one or more manufacturers who transacted with the owner of the ICN server to provide such processing, and after validating the coupon, the ICN server transmitted second coupon information through the network to the point-of-sale terminal, which then sent redeemed coupon related information back to the ICN server to validate and

store the redeemed coupon data.  Id. at *1–2. The Inmar case involved

representative claims from three patents, with one of such claims reciting:

> A computer-readable medium storing instructions executable by a processor to perform operations for processing coupons across a network, the operations comprising:
>
> receiving, at a coupon processing server, a unique account identifier from a first point of sale terminal via a network, where the coupon processing server is configured to communicate with a plurality of point of sale terminals, where the unique account identifier was scanned at the first point-of-sale terminal which is located at a retail store and where the coupon processing server is at a location that is remote from the retail store;
>
> in response to receiving the unique account identifier, determining whether at least one valid coupon is associated with the unique account identifier in a database of accounts;
>
> in response to determining that at least one valid coupon is associated with the unique account identifier in the database of accounts, transmitting, from the coupon processing server, an indication of the at least one valid coupon to the first point of sale terminal via the network, wherein the indication includes the at least one valid coupon;
>
> in response to receiving, at the coupon processing server from the first point of sale terminal, an indication of at least one redeemed coupon, updating the database of accounts and transmitting, from the coupon processing server to a manufacturer associated with the at least one redeemed coupon, an indication that the at least one redeemed coupon was redeemed against a purchased transaction, where the at least one redeemed coupon is at least one of the at least one valid coupon.

Id. at *2.

In addition to concluding that the patents were eligible because the claimed

system had a "non-conventional configuration" and that the technical improvement

of a computer was not a "*per se* test for patent eligibility," the <u>Inmar</u> court emphasized that "the non-traditional design recited in the representative claims makes improvements over the ability of preexisting coupon-clearing architecture to detect fraudulent transactions." <u>Id.</u> at *6–8.

Similar to the claims in <u>Inmar</u>, the claims in the '329 Patent recite a "non-traditional design" that makes improvements to the analysis and detection of acoustic data. The specification frames the various problems in terms of how to improve computer technology, and as discussed above, the Court finds that the specification details are in the claims. The patented system allows multiple devices to work together to ascertain the status of the environment or detect specific events occurring within the environment, uses keywords to generate user inputs, and can differentiate between those user inputs and other audio signals by utilizing the optimal subset of acoustic devices in the environment, information and functionalities that were not obtainable using a single device. <u>See</u> '329 Patent at 3:14–22. Claim 1 and the other dependent claims recite how the system operates, stating that the first set, second set, or a combination of sensor acoustic data received from the "controller" operates to identify the presence of speech relevant to the "scene" or problem.

Harman also contests whether claims being "directed to a distributed network architecture that improves upon various facets of computer technology"

are abstract, contending that claims directed to a "communication over a network to interact with network-attached devices" have been found to be abstract. <u>See</u> Def.'s Reply Br. at 2–3 (citing <u>ChargePoint</u>, 920 F.3d 759 (holding that claims involving a network-controlled charging system for electric vehicles were directed to the abstract idea of "communicating over a network for device interaction"); <u>Ericsson Inc. v. TCL Comm'cns Tech. Holdings Ltd.</u>, 955 F.3d 1317 (Fed. Cir. 2020) (holding that claims involving a platform for a mobile terminal for a wireless telecommunications system were directed to the abstract idea of "controlling access to, or limiting permission, to resources"); <u>F45 Training Pty Ltd. v. Body Fit Training USA Inc.</u>, No. 20-cv-01194, 2022 WL 17177621 (D. Del. Nov. 17, 2022) (holding that claims involving the configuring and operating a fitness studio using information received over a computer network were abstract)).  The Court does not find these cases to be analogous to the claims in the '329 Patent or support the proposition that claims "directed to a distributed network architecture that improves upon various facets of computer technology" are abstract.

Therefore, it is plausible that the '329 Patent is not directed to an abstract idea because its claims are directed to "technical solutions to technical problems through receiving audio and differentiating speech with its system."  Further, there is a limited record at the motion to dismiss stage and claim construction may be necessary to determine the plain meaning of the terms.  Because the claim is

plausibly directed to a non-abstract idea, the Court need not discuss <u>Alice</u>'s step two.

Accordingly, the '329 Patent plausibly recites patent-eligible subject matter under § 101 and Count II will not be dismissed based on a lack of eligible subject matter.

### 2. Induced Infringement

Techiya filed a post-suit induced infringement claim for the '329 Patent, alleging that Harman had notice of its infringement "at least since the date of the filing of the complaint in this action," and indirectly infringed and continues to indirectly infringe by actively inducing infringement of the '329 Patent by others, such as users of the Accused Product within this district. Compl. ¶¶ 47, 51. Harman does not argue in this Rule 12(b)(6) motion that Techiya failed to plead a direct infringement claim on which relief can be granted for the '329 Patent, so for the purposes of this motion, the Court presumes that Techiya plausibly pled direct infringement of the '329 Patent.

The '329 Patent was issued on February 21, 2023, filed on April 20, 2021, and is referred to as one of the "Post-2020 Patents," along with the '587 Patent. Def.'s Moving Br. at 15.

The Parties dispute whether post-suit knowledge may support claims of induced infringement after the filing of the complaint. This issue generally arises

when an amended complaint is filed, with the dispute over whether the allegations

of knowledge and continuing infringement refer, at minimum, to the period

between the filing of the original complaint and the filing of the amended

complaint.

The Court takes the approach that pre-filing knowledge is not required to

state a claim for inducement.  See Clouding IP LLC v. Amazon.com, Inc.

("Clouding IP"), Nos. 12-cv-00641-LPS, 12-cv-00642-LPS, 12-cv-00675-LPS,

2013 WL 2293452 (D. Del. May 24, 2013); DoDots Licensing Sols. LLC v.

Lenovo Holding Co., Inc. ("DoDots"), No. 18-cv-00098-MN, 2019 WL 3069773,

at *3 (D. Del. July 12, 2019) (concluding that induced infringement claims based

on post-suit conduct is permissible).  The complaint can be the source of the

knowledge required to sustain claims of induced infringement occurring after the

filing date and can provide sufficient knowledge of the patents-in-suit for purposes

of stating a claim for indirect infringement, after an amended complaint is filed.

See Groove Digital, Inc. v. Jam City, Inc., No. 18-cv-01331-RGA, 2019 WL

351254 (D. Del. Jan. 29, 2019); Walker Digital, LLC v. Facebook, Inc., 852 F.

Supp. 2d 559 (D. Del. 2012) ("In sum, if a complaint sufficiently identifies, for

purposes of Rule 8, the patent at issue and the allegedly infringing conduct, a

defendant's receipt of the complaint and decision to continue its conduct despite

the knowledge gleaned from the complaint satisfies the requirements of Global-

Tech."); <u>SoftView LLC v. Apple Inc.</u>, No. 10-cv-00389-LPS, 2012 WL 3061027 (D. Del. July 26, 2012) ("An accused infringer is on notice of the patent(s)-in-suit once an initial pleading identifies the patents-in-suit, and a patentee that successfully proves the remaining legal elements of indirect infringement is entitled to recover for any post-filing indirect infringement of those patents.").

The complaint alone cannot operate to establish knowledge, however, without being amended.  <u>See Wrinkl, Inc. v. Facebook, Inc.</u> ("<u>Wrinkl</u>"), No. 20-cv-01345-RGA, 2021 WL 4477022, at *6 (D. Del. Sept. 30, 2021); <u>Helios Streaming, LLC v. Vudu, Inc.</u>, No. 19-cv-01792-CFC-SRF, 2020 WL 2332045, at *4–5 (D. Del. May 11, 2020), <u>report and recommendation adopted</u>, 2020 WL 3167641 (D. Del. June 15, 2020) (stating that this district addresses the sufficiency of amended pleadings for post-filing knowledge of inducement and not the original complaint). Techiya may seek leave to amend the complaint to allege knowledge from the filing of the original complaint.  <u>See Wrinkl</u>, 2021 WL 4477022, at *6 ("For indirect infringement, if the plaintiff were not permitted to amend a complaint, it would be the equivalent of saying that the plaintiff's failure to give notice of the patents outside of litigation operated as a bar to bringing a suit for indirect infringement").  Because the Court found sufficient allegations to support a pre-suit induced infringement claim, however, Techiya may choose to not amend its post-suit claim.

### 3.    Willful Infringement

Techiya also filed a post-suit willful infringement claim alleging that
Harman had notice of its infringement of the '329 Patent "at least since the date of
filing of the complaint in this action" and willfully infringed and continues to
infringe the '329 Patent.  Compl. ¶¶ 47, 56.

The Parties dispute whether post-suit knowledge may sustain claims for
willful infringement.  Judges in this district have taken different views on whether
a plaintiff can sufficiently plead knowledge of a patent-in-suit in an amended
complaint by referring back to the notice that the accused infringer received of the
patent's existence via the filing of a prior complaint in the same case for indirect
infringement or willful infringement claims.  Compare Cleveland Medical Devices
Inc. v. ResMed Inc., No. 22-cv-00794-GBW, 2023 WL 6389628, at *6 (D. Del.
Oct. 2, 2023) (Andrews, J.) (concluding that the complaint itself cannot serve as
the basis for a defendant's actionable knowledge for willful infringement claim),
Pact XXP Schweiz AG v. Intel Corp, No. 19-cv-01006-JDW, 2023 WL 2631503,
at *5, recons. denied, 2023 WL 3934058 (D. Del. Mar. 24, 2023) (Wolson, J.)
(concluding that a defendant's alleged knowledge based solely on the content of
that complaint or a prior version of the complaint filed in the same lawsuit is
insufficient for a willful infringement claim), Wrinkl, 2021 WL 4477022, at *6–7
(concluding that an amended complaint can establish post-suit knowledge for

indirect infringement claims but not for willful infringement claims), and

ZapFraud, Inc. v. Barracuda Networks, Inc., 528 F. Supp. 3d 247, 249–50 (D. Del.

2021) (Connolly, J.) (concluding that a "complaint itself cannot be the source of

the knowledge required to sustain claims of induced infringement and willfulness-

based enhanced damages"), with ICON Health & Fitness, Inc. v. Tonal Sys., Inc.

("ICON Health & Fitness"), No. 21-cv-00652-LPS-CJB, 2022 WL 611249, at *3

(D. Del. Feb. 7, 2022) (Burke, J.) (concluding that post-suit induced infringement

and willful infringement claims are permissible with knowledge of a patent-in-suit

in an amended complaint), Ravgen, Inc. v. Ariosa Diagnostics, Inc. ("Ravgen"),

No. 20-cv-01646-RGA-JLH, 2021 WL 3526178, at *4 (D. Del. Aug. 11, 2021)

(Hall, J.) (concluding that a party may maintain a claim for willful infringement

made in an amended complaint if the accused infringer first gained knowledge of

the patent from the original complaint), DoDots, 2019 WL 3069773, at *3 (D. Del.

July 12, 2019) (Noreika, J.) (concluding that induced infringement claim based on

post-suit conduct is permissible), and Clouding IP, 2013 WL 2293452, at *4

(Stark, J.) (concluding that "for purposes of pleading willful infringement, there

appears to be little practical difference between a pre-complaint notice letter

informing a defendant about a patentee's allegation of infringement and a

subsequently-superseded original complaint formally alleging infringement").

Techiya argues that the complaint itself, without an amended complaint superseding it, can provide notice of post-suit willfulness.  See Pl.'s Opp'n at 17 (citing DoDots, 2019 WL 3069773, at *3; ICON Health & Fitness, 2022 WL 611249, at *3 n.5).  During oral argument, Techiya cited and emphasized the holding in Ravgen, a case which adopted its reasoning from IOENGINE, LLC v. PayPal Holdings, Inc. ("IOENGINE"), No. 18-cv-00452-WCB, 2019 WL 330515 (D. Del. Jan. 25, 2019), to find that a second amended complaint provided notice, to support its proposition.  See Pl.'s April 23 First Letter Suppl. Authority at 1. Specifically, Techiya highlights a quote in Ravgen, which states that "if a defendant is on notice of a patent and the allegations of the infringement as a result of [the] filing of a pleading, there is no reason it should not be answerable for willful infringement after that date if the patentee can prove the requisite level of culpable behavior during the post-suit period."  See Ravgen, 2021 WL 3526178, at *4; see Pl.'s April 23 First Letter Suppl. Authority; see also IOENGINE, 2019 WL 330515, at *7 (concluding that post-suit knowledge for indirect and willful infringement is conveyed by service of the original complaint).

This Court adopts the approach that the original complaint, later superseded by the amended complaint, is sufficient to support a post-suit willful infringement claim at the motion to dismiss stage.  This approach follows most of the cases in this district concluding that notice from a complaint is sufficient for indirect and

willfulness claims when an original complaint is superseded by an amended complaint.  See Ravgen, 2021 WL 3526178, at *2 (involving a second amended complaint for post-suit willful infringement claim); DoDots, 2019 WL 3069773, at *1 (involving a second amended complaint for post-suit induced infringement claim); ICON Health & Fitness, 2022 WL 611249, at *1 (involving a first amended complaint for pre-suit induced and willfulness claims but nothing that re-pleading is not necessary for post-suit claims).

The Court discerns little practical difference between a pre-complaint notice letter and the filing of an original complaint that is later superseded by an amended complaint.  See Clouding IP, 2013 WL 2293452, at *4.  Techiya may amend its complaint to allege notice for its post-suit willful infringement claim based on the original complaint.

The Court partially dismisses Count II without prejudice and Techiya may seek leave to file an amended complaint.

## IV.   Infringement of the '587 Patent (Count III)

Count III alleges that Harman directly, indirectly, and willfully infringed, and continues to infringe, at least claim 1 of the '587 Patent with the Accused Product.  Compl. ¶¶ 59–60.

### 1.      Direct Infringement

Harman contends that the Complaint fails to sufficiently plead the claimed "notifying a user" limitation for the '587 Patent, stating that it only alleges that the Accused Product detects a sonic signature without a resulting notification.  Def.'s Moving Br. at 14.

Techiya asserts that the Complaint adequately alleges that the Accused Product notifies a user when it sends ambient and external signals to the car speakers when the following allegations are taken together: "the captured ambient acoustic sound is communicated to the cockpit of the vehicle"; "the data stored in the audio buffer can be sent to the car speakers"; and the Accused Product's ability to "increase[] awareness of approaching vehicles," as discussed in the marketing materials.  Pl.'s Opp'n Br. at 14–15.

Harman replies that the "notifying a user" step is not sufficiently pled because the Complaint alleges that the audio playback occurs "in response to a user request," rather than "when the sonic signature is detected."  Def.'s Reply Br. at 5. Harman argues that the Complaint does not include the "upon a user request" language.  Id.

Claim 1 of the '587 Patent, in pertinent part, recites:

an audio device comprising:

a microphone configured to measure ambient sound and generate a microphone signal;

a speaker configured to emit an audio signal;

a memory configured to store instructions;

an audio buffer configured to store at least a portion of the microphone signal;

a data buffer;

a processor operatively coupled to the memory, the processor operatively coupled to the audio buffer, the processor operatively coupled to the data buffer, wherein the processor is configured to execute the instructions to perform operations comprising:

receiving the microphone signal;

sending a portion of the microphone signal to the audio buffer;

analyzing the audio buffer for detecting a sonic signature;

notifying a user when the sonic signature is detected;

sending a modified microphone signal to the data buffer replacing or adding to previous data stored in the data buffer; and

sending a portion of the data stored in the data buffer, spanning a time period, to the speaker *in response to a user request*, wherein the user request is one of the sonic signature that is a voice command or a manual input from the user interface.

'587 Patent at 24:47–25:9 (emphasis added).

The Complaint alleges that "[u]pon information and belief, the captured

ambient acoustic sound is communicated to the cockpit of the vehicle.  Within the

cockpit processor, a portion of the microphone signal is placed in an audio buffer and analyzed for the presence of a sonic signature, such as a voice command from '[e]xternal speech recognition' or 'verbal interaction.'  Then, data stored in the audio buffer can be sent to the car speakers upon a user request."  Compl. ¶ 64.

Not every single element of a patent claim needs to be pled for a claim to be plausible.  See Bot M8, 4 F.4th at 1352.  The allegations identify the infringing Accused Product and the specific infringing functionality by describing how detection of a sonic signature sends data stored in the audio to the car speakers' buffer upon user request.  Thus, the Complaint sufficiently pleads a direct infringement claim for the '587 Patent.

### 2.    Induced Infringement

Techiya filed a post-suit induced infringement claim, alleging that Harman had notice of its infringement of the '587 Patent "at least since the date of filing of the complaint in this action" and indirectly infringed and continues to indirectly infringe by actively inducing infringement of the '587 Patent by others, such as users of the Accused Product within this district.  Compl. ¶¶ 61, 65.  The '587 Patent was issued March 21, 2023, filed on May 4, 2022, and is referred to as one of the "Post-2020 Patents."  Because the Complaint without being amended is insufficient notice for post-suit indirect infringement claims, Techiya failed to adequately plead induced infringement of the '587 Patent.

### 3.      Willful Infringement

Techiya filed a post-suit willful infringement claim, alleging that Harman had notice of its infringement of the '587 Patent at least since the date of filing of the complaint in this action and willfully infringed and continues to willfully infringe the '587 Patent.  Compl. ¶¶ 61, 70.  Because the Complaint without being amended is insufficient notice for post-willfulness claims, Techiya failed to adequately plead post-suit willful infringement of the '587 Patent.

Therefore, Count III sufficiently states a claim for direct infringement, but fails to plead post-suit claims for induced and willful infringement of the '587 Patent.  The Court partially dismisses Count III without prejudice and Techiya may seek leave to file an amended complaint.

### V.      Conclusion

For the foregoing reasons, the Court denies in part and grants in part Harman's motion to dismiss.  The Court grants the motion to dismiss the '329 Patent (Count II) and the '587 Patent (Count III) as to the post-suit induced and willful infringement claims.  The Court denies the motion to dismiss the '620 Patent (Count I) as to all claims, the '329 Patent (Count II) for patent-eligible subject matter, and the '587 Patent (Count III) as to the direct infringement claim.

ACCORDINGLY, IT IS HEREBY

**ORDERED** that Defendant's Motion to Dismiss (D.I. 14) is denied in part

and granted in part.  The motion is granted as to the induced and willful

infringement claims in Counts II and III, which are dismissed without prejudice.

The motion is denied as to all infringement claims in Count I, the patent-eligible

subject matter challenge to Count II, and the direct infringement claim in Count III.

IT IS SO ORDERED this 20th day of May, 2024.

/s/ Jennifer-Choe Groves
Jennifer Choe-Groves
U.S. District Court Judge[*]

---

[*] Judge Jennifer Choe-Groves, of the United States Court of International Trade,
sitting by designation.